## CUSHMAN *versus* SMITH.

An article of the Constitution provides, that " private property shall not be taken for public use, without just compensation."

By the *taking* of property, within the scope of that provision, is meant such an appropriation of it as deprives the owner of his title or of a part of his title.

That provision, when applied to real estate, precludes the acquisition of any title or easement or permanent appropriation without the actual payment or tender of a just compensation.

It did not dislodge the paramount dominion, which the sovereignty has over the property-rights of each individual. It merely relaxed that dominion so far as to provide that property, *taken by the exercise of that dominion*, should be paid for.

It does not preclude the Legislature from authorizing acts, for the public benefit, though operating injuriously, and without compensation, upon private property, *unless* such property is *taken* and *appropriated*, or is *attempted* to be taken and appropriated from the owner.

It does not preclude the Legislature from authorizing an exclusive occupation, temporarily, of real estate, belonging to an individual, without previous compensation, as a proceeding incipient to the acquisition of a title or of an easement, for public use.

The right to such temporary occupation, as an incipient proceeding, will become extinct by an unreasonable delay to make actual payment or tender of compensation, and to complete the proceedings requisite for acquiring the intended title or easement.

An action of trespass, *quare clausum*, may be maintained to recover damages for the *continuance* of such occupation, unless within a reasonable time after its commencement, compensation be made or tendered.

Under such circumstances, an action of trespass or an action on the case, may be maintained to recover damages for *all the injuries*, occasioned by the prior occupation.

It is requisite that enactments, in order to justify the taking of private property for public use, should designate the means to be pursued for obtaining the compensation.

*It seems*, that the distinction, which asserts that private property *may* be taken for public use, without previous compensation, when the payment is charged upon a *public* corporation, and that it may *not* be so taken, when the charge is attached to a mere *private* corporation, is untenable.

By the charter of the Buckfield Branch Rail Road Company, it was not the intention to require the compensation of land-owners to be paid, before a right should vest in the corporation to take exclusive occupation of land, for the purpose of making the road.

ON FACTS AGREED.

TRESPASS, *quare clausum.*

The facts called for a construction of that article of the constitution which provides that, "*private property shall not be taken for public use without just compensation.*"

The Buckfield Branch Rail Road Company was chartered by the Legislature, with authority to locate and construct a rail road, and to run engines and cars upon it; — and to take and hold land for the location, construction and convenient use of the road, " to be held, as lands taken and held for public highways;" and the damage thereby occasioned to the land-owner, when not otherwise agreed upon, was to " be ascertained and determined by the County Commissioners, under

the same conditions and limitations as are by law provided, in case of damage by laying out highways."

The mode, prescribed by law for the ascertainment of damage by the laying out of highways, is by application to, and by proceedings in, the Court of County Commissioners.

On an application to that Court for an ascertainment of the damage, the land-owner might request, that the rail road company be required to give security, to the satisfaction of the Commissioners, for the payment of such damage and cost as might be finally awarded ; — and " all the right or authority of the corporation, to enter upon or use the land, except for making surveys, was to be suspended, until they shall give such security.

No application for the assessment of such damage was to " be sustained, unless made within three years from the time of taking such real estate."

The corporation located and constructed the road, crossing the plaintiff's land. In June, 1849, and within the three years, he presented a petition to the Court of County Commissioners, praying that his damages might be assessed, and that the corporation should be required to give him security therefor. A decision was accordingly made by that Court, in December, 1849, assessing the damage, but omitting to require the security. The plaintiff being dissatisfied with that assessment, in June, 1850, filed a petition, in the nature of an appeal, (jointly with other claimants for land damage, who were also dissatisfied with the decision of the County Commissioners upon their several applications,) praying that the damages might be assessed by a jury. This petition, however, contained no request for security. Upon this petition, such proceedings were had, that the plaintiff's damage was fixed at $250, and the Commissioners, in December, 1850, rendered judgment for that sum, with costs, and ordered that security should be given therefor by the corporation.

Upon that judgment a warrant of distress issued, Feb. 6, 1851, which was returned in no part satisfied. And the dam-

age thus awarded has never been paid or tendered, nor has any security for it been given.

The corporation, in Oct. 1849, mortgaged to the defendant the road and franchise, together with their engines and cars; and he, in May, 1851, having· previously taken possession as mortgagee, run the engines and cars upon the road across the plaintiff's land, which is the alleged trespass for which this action is brought, the writ being dated Oct. 10, 1851.

" If the foregoing facts do not ʻconstitute a defence; or if, under ʻthe constitution of the State, the corporation had no authority so to enter and use the plaintiff's land, without just compensation paid or secured to the plaintiff, judgment is to be entered for twenty dollars damage with costs."

*Fox*, for the plaintiff.

*Fessenden & Deblois*, for the defendant.

1. The rail road was legally located. The plaintiff's right to enter upon it, or to maintain trespass on account of it, was thereby lost. By that location, the corporation, and this defendant, as their mortgagee, took a perpetual easement; an absolute right of possession for all the purposes of a rail road; which necessarily excludes all right of possession in the owner of the soil, so long as the rail road exists.

2. If the plaintiff has not realized all the remuneration to which he was entitled, it has not resulted from any fault of the corporation or of the defendant. To entitle him to security for the amount of his damage, he must not only apply for it upon the petition for an assessment, but must obtain an order of the County Commissioners to that effect. That security they cannot adjudge to him, except upon his express application for it.

The plaintiff did, indeed, in his *first* petition, apply for such an order, but it was not allowed. No adjudication for it was made. His right thereby became extinguished.

True, in the proceedings of the County Commissioners, upon the *second* petition, they ordered that such security should be given, but that order was unauthorized. For, upon *this*

*petition,* no such order was requested. There was no basis, upon which it could rest ; it was, therefore, merely void.

The two petitions might be considered continuous or connected, for the purpose of an *assessment ;* but for the purpose of *obtaining security,* there was no connection between them. The first judgment closed all question as to the matter of security. *Woodman* v. *Somerset,* 25 Maine, 300. The omission in the second petition to request security was an implied and effectual waiver of the right to it.

But, further, the issuing of the warrant of distress against the corporation, was a waiver of all other remedies.

Again, as another evidence of such waiver, it will be noticed that, after the plaintiff's petition for security had been neglected or refused by the Commissioners, he suffered the corporation to proceed and expend large sums of money, in constructing the road and putting cars upon it, without interference or objection by him. *Goodwin* v. *Hallowell,* 12 Maine, 300 ; *Barre Turnpike Co.* v. *Appleton,* 2 Pick. 430 ; *Ipswich* v. *Essex,* 10 Pick. 519 ; *Merrill* v. *Berkshire,* 11 Pick. 269.

3. It is incident to the sovereignty of every government, that it may take private property for public uses, *of the necessity or expediency of which the government must judge.* 1 Baldwin's R. 220 ; 1 U. S. Digest, 560 ; *Cooper* v. *Williams,* 4 Ham. (Ohio,) 253 ; *O'Hara* v. *Lexington R. R. Co.* 1 Dana, (K'y,) 232 ; *Perry* v. *Wilson,* 7 Mass. 395 ; *Boston Mill Dam* v. *Newman,* 12 Pick. 467 ; *Spring* v. *Russel,* 7 Greenl. 273.

The government must alone judge of the necessity and expediency. *Spring* v. *Russell,* 7 Greenl. 273.

The provisions of the Act incorporating this rail road, enabling those, whose lands are taken, to obtain their damages, answer all the constitutional requirements, relating to compensation. *Deering* v. *York and Cumberland Rail Road Co.,* unreported ; *Boston Dam* v. *Newman,* 12 Pick. 467.

Shepley, C. J. — The action is trespass *quare clausum.* The plaintiff is admitted to have been the owner of land, upon which the Buckfield Branch Rail Road has been made.

The alleged acts of trespass are admitted. The justification presented is, that the rail road was legally located, constructed and used, upon the plaintiff's land; and that the acts alleged to have been trespasses were done in the rightful use of that road.

The Act creating the corporation, authorized it to locate, construct and complete a rail road on a prescribed course between certain places. It required, that the corporation should "pay such damages as shall be ascertained and determined by the County Commissioners for the county, where such land or other property may be situated, in the same manner and under the same conditions and limitations, as are by law provided in the case of damages by the laying out of highways." And it provided, that the land so taken should "be held as land taken and appropriated for public highways." The corporation by its charter, is entitled to all the powers, privileges and immunities, and subjected to all the duties and liabilities prescribed in the eighty-first chapter of the Revised Statutes. By that chapter it was authorized to take and hold so much real estate, as might be necessary for the location, construction, and convenient use of the road. That statute provides, that when application for an estimate of damages is made, either by the corporation or by the owner of real estate, the Commissioners, if requested by any such owner, shall require the corporation to give security to the satisfaction of the Commissioners, for the payment of all such damages and costs, as shall be awarded and finally determined by a jury, or otherwise, for the real estate so taken; and the right or authority of said corporation, to enter upon, or use said real estate, except for making surveys, is suspended, until it shall give such security.

The plaintiff appears to have presented to the County Commissioners at their session, held in the month of June, 1849, a petition to have his damages assessed. It contained a request, that the corporation should be required to give security for the payment of them. An assessment of damages was made by the Commissioners, and entered of record at their

session, held in the month of December, 1849. At their session held in the month of June, 1850, the plaintiff united in a petition with others to have his damages assessed by a jury. The parties agreed upon a committee instead of a jury, and that committee made a report of their revision and assessment of damages at the session of the Commissioners held in the month of December, 1850; and an order was then made, that the corporation should give security for payment of the damages awarded. A warrant for collection of the damages issued on Feb. 6, 1851, which was returned on April 28, 1851, in no part satisfied. The damages awarded, have never been paid or tendered; nor has any security been given for their payment.

The provision of the statute, authorizing petitions for the assessment of damages to be presented at any time within three years, and not afterwards; and, that requiring that the damages should be assessed as in laying out of highways, and, that respecting security for their payment, clearly indicate, that it was not the intention of the Legislature, to require an assessment and payment of damages to be made before an exclusive occupation of the land was authorized, for the purpose of making the road.

If such be a correct construction of the Act, and of all other Acts, respecting the construction of rail roads in this State, deriving their powers from the general Act regulating the construction and use of such roads, the public must suffer great inconvenience, if they must be regarded as in conflict with any provision of the constitution. If a rail road or highway cannot be established and constructed without a previous assessment and payment or tender of damages, great obstacles and delays will be interposed to prevent the completion of such public improvements.

These considerations would however afford no justification for an attempt to uphold such statute provisions, and to continue the long established course of proceedings, in violation of any provision of the constitution.

There has been a serious difference of opinion respecting

the requirements and construction of those constitutional provisions, which declare in the same or similar terms, that "private property shall not be taken for public uses without just compensation."

How far legislation may proceed to authorize acts to be done, without first making or tendering compensation, and where it becomes arrested by the provision, has been considered by many of the ablest men and most distinguished jurists of the country. And yet there is an indication arising out of the conflict of opinion, and the difficulty of reconciling the positions attempted to be established with each other, and with any sound and pervading principle, that the whole truth has not been reached.

The more thoroughly it has been examined in connection with legislative enactments, the more clearly has it been perceived, that serious difficulties, or inconveniences, or losses, may arise in the rigid and uniform application of any suggested construction to the proceedings required in all classes of public improvements. How can a construction be correct, which will allow acts to be done for the purpose of making one kind of public improvement, and prohibit the like acts to be done under like circumstances for the purpose of making another kind of public improvement? Which will authorize acts for the purpose of making a public highway, and prohibit them for the purpose of making a rail road? Which will authorize them for the purpose of making a canal or railway, when made by a State, county, city or town, and prohibit them when the same public improvement is made by a private corporation? And yet such may be the effect of many, if not of most, of the constructions suggested or insisted upon. If, upon principle and sound reasoning, the provision must operate alike upon the construction of all classes of public improvements made by the appropriation of private property to public use, the effect of any proposed construction of the clause may be examined in its practical operation, to ascertain if such could have been the intention of the framers of the constitution.

If the construction be such as to require payment in all cases for private property so taken before it can be exclusively *occupied* for public use, the result must be, that no such improvement can be effectually or beneficially commenced even by a State, county, city, or town, without waiting to have an assessment of damages first made for each person, whose estate is in some degree to be occupied, upon the whole line of the contemplated improvement.

Such a construction would prevent the laying out and making of highways and streets over private estates believed to be benefited and not injured thereby, before there had been an adjudication obtained, that no damages were occasioned ; and it would deprive persons thinking themselves aggrieved by such an adjudication or by one estimating the damages to be too little in their judgment, from having such adjudications revised and finally determined by some other tribunal without delaying the progress of the public improvement.

It is believed to have been the long established course of proceeding in this part of the country at least, to authorize the exclusive *occupation* of land required for such public uses as the laying out of highways and streets, by making provision by law for compensation to the owner, to be subsequently paid. And in many cases authorizing the damages to be finally ascertained as well as paid subsequently. This course of proceeding existed, so far as is known, without complaint, long before the revolution, which cast off the British dominion ; and of course was well known to the framers of the constitution which first contained this prohibitory clause for the protection of private property. Was it the intention to interrupt such course of proceeding and to provide a remedy for a grievance already experienced, or only to prevent private property from being taken from the owner and permanently appropriated to public use without compensation ? Constitutional provisions are often and legitimately explained by considering the actual state of facts at the time of their adoption. Thus the provision in the constitution of the United States for the regulation of commerce is explained to include navi-

gation, by reference to the state of facts existing at the time. By these, or other considerations, many minds appear to have been led to the conclusion, that private property might be absolutely taken and permanently appropriated to public use without compensation being first made, when provision was made by law for compensation to be subsequently made from the treasury of the State, or of a county, city or town.

Does experience teach, that the owner, in such cases, will always be certain to obtain compensation? History informs us, that kingdoms and states have not always paid their just debts in full, that they have often paid them only in promises, which would not command gold or silver without a large discount.

When the private property of citizens residing in a county, city or town, may be taken to pay the debts of the corporation, there may be reason to expect, that its debts will be certainly paid. But the law making private property liable to be taken for payment of the debts of such corporations may at any time be repealed or altered; and the corporation in its corporate capacity may not have property, from which payment can be obtained.

Is the distinction attempted to be made between taking private property, without first making compensation, when provision is made for payment by a State, county, city or town, and when it is made for payment by a private corporation, a sound one? Can that be a correct construction of the provision, which would authorize legislation, by which the owner of an estate might be deprived of it without being first paid, whenever in the judgment of some Court or tribunal, it might be morally certain, that he could afterwards obtain compensation; and which would not authorize it, whenever in the judgment of such Court or tribunal it was not so certain, that he could obtain it? That would make the title pass from the owner to the public use, not upon payment of compensation, but upon the opinion of certain official persons, that a fund or other means had been provided, from which he might obtain payment. If such be a correct construction, it

Cushman *v.* Smith.

would follow that the title to private property may be made to pass from the owner to a private corporation for public use; when that corporation should be found to possess the means or to furnish security, which would render it as certain, that compensation could be subsequently obtained from it, as from the treasury of a State, county, city or town.

These and other considerations present themselves as serious objections to a construction, which would permit an owner of property to be deprived of it without compensation actually paid or tendered to him, whether it be taken for public use by a State, county, city, town or private corporation.

If such a construction be inadmissible, as well as one which would prevent an exclusive occupation of a temporary character, without payment of compensation, the inquiry is suggested, whether by a correct construction such results may not be avoided.

This provision of the constitution was evidently not intended to prevent the exercise of legislative power to prescribe the course of proceeding, to be pursued to take private property and appropriate it to public use. Nor to prevent its exercise to determine the manner, in which the value of such property should be ascertained and payment made or tendered. The legislative power is left entirely free from embarrassment in the selection and arrangement of the measures to be adopted to take private property and appropriate it to public use, and to cause a just compensation to be made therefor.

The provision was not introduced or intended to prevent legislation, authorizing acts to be done, which might be more or less injurious to private property not taken for public use. It is not unusual to find, that private property has been greatly injured by public improvements, when there has been no attempt to take it for public use. The records of judicial proceedings show, that private property in rail roads, turnpike roads, toll bridges, and ferry ways has been often greatly injured, and sometimes quite destroyed by acts authorized by legislation, which, according to judicial decisions, did not violate any provision of the constitution.

Private property is often injured by the construction and grading of highways and rail ways, when no attempt has been made to change its character from private to public property. The cases of *Day* v. *Stetson*, 8 Greenl. 365; *Callender* v. *Marsh*, 1 Pick. 418; *Canal Appraisers* v. *The People*, 17 Wend. 571; and *Susquehanna Canal Co.* v. *Wright*, 9 Watts & Sergt. 9, present examples of it.

The provision was not designed, and it cannot operate to prevent legislation, which should authorize acts, operating directly and injuriously, as well as indirectly upon private property, when no attempt is made to appropriate it to public use. An instance of this kind of legislative action will be found in the case of the *Commonwealth* v. *Tewksbury*, 11 Metc. 55, where a person was held indictable for the removal of gravel from his own land contrary to a statute provision, which did not assume to appropriate it to public use, or to make compensation for it.

The design appears to have been simply to declare, that private property shall not be changed to public property, or transferred from the owner to others, for public use, without compensation; to prevent the personal property of individuals from being consumed or destroyed for public use without compensation, not to protect such property from all injury by the construction of public improvements; not to prevent its temporary possession or use, without a destruction of it, or a change of its character. It was designed also to prevent the owner of real estate from being deprived of it, or of an easement in it, and to prevent any permanent change of its character and use without compensation. While it was not designed to prevent legislation, which might authorize acts upon it, which would by the common law be denominated trespasses, including an exclusive possession for a temporary purpose, when there was no attempt to appropriate it to public use. Such acts of legislation might be very unjust, and it may be presumed, that no legislative body would make such enactments without making provision for the compensation of injuries to private property, occasioned by acts designed to

promote the public good. The claim upon the justice of the State for compensation might be perfect, while compensation would not be secured by any provision of the constitution.

If this provision of the constitution does not prevent enactments, authorizing an exclusive possession of land owned by an individual for a temporary purpose, without compensation, when there is no attempt to appropriate it to public use, will it operate to prevent an exclusive occupation of it temporarily as an incipient proceeding to the acquisition of a title to it, or to an easement in it? Will it prohibit legislation authorizing acts to be done, when the intention is by them and by other means to be adopted, to secure finally a title to the land or to an easement in it for public use, and allow the same acts to be done upon the same land, when done without any such intention? Was it the design to make the intention, with which the act was performed, the criterion to determine, whether it could or could not be authorized by the legislative department?

This leads to a further inquiry to ascertain the sense, in which the word *taken* was used in the constitution.

That word is used in a variety of senses, and to communicate ideas quite different. Its sense, as used in a particular case, is to be ascertained by the connection in which it is used, and from the context, the whole being applied to the state of facts, respecting which it was used.

It cannot well be denied, and it is generally admitted, to have been used in constitutions containing this clause, to require compensation to be made for private property appropriated to public use, by the exercise on the part of the government of its superior title to all property required by the necessities of the people to promote their common welfare. This appears to have been denominated the right of eminent domain, of supereminent dominion, of transcendental propriety. These terms are of importance only to disclose the idea, presented by them, that the right to appropriate private property to public use rests upon the position, that the government or sovereignty claims it by virtue of a title superior

to the title of the individual, and that by its exercise the individual and inferior title becomes wholly or in part extinguished ; extinguished to the extent, to which the superior title is exercised. To take the real estate of an individual for public use, is to deprive him of his title to it, or of some part of his title, so that the entire dominion over it no longer remains with him. He can no longer convey the entire title and dominion.

The exclusive occupation of that estate temporarily, as an initiatory proceeding to an acquisition of a title to it, or to an easement in it, cannot amount to a taking of it in that sense. The title of the owner is thereby in no degree extinguished. He can convey that title while thus exclusively occupied, as he could have done before. Should he do so by a conveyance containing a covenant, that it was free of all incumbrances, that covenant would not make him liable for such an exclusive occupation, unless it be admitted, that a title to the land or to an easement in it can be acquired without making compensation, and this is denied.

A construction of the provision, which would permit legislation authorizing private property to be exclusively occupied, without first making compensation as an incipient proceeding to the acquisition of a title to it, or to an easement in it, and which would not authorize the title of the owner to be extinguished or impaired without compensation, may be somewhat novel, but it will not be found to be unsupported by positions asserted and maintained in judicial opinions. It is generally admitted in them, that examinations and surveys may be authorized by legislative enactments without a violation of the constitutional provision and without provision for previous compensation. Where is to be found the limit of the legislative power to authorize trespasses of a more extensive and injurious character, which do not extinguish or entrench upon the title of the owner? Does that provision of the constitution permit the legislative power to authorize trespasses not very injurious to private property without providing for previous compensation and prohibit it from authorizing those of a

little more or much more injurious character, which do not in any degree impair or affect the title of the owner? It was not the intention to make the exercise of the legislative power depend upon the extent of the injury, which the authorized acts might occasion, if the title was not invaded.

There are cases, in which an opinion is expressed, that all injuries to private property authorized by the legislative power, can only be authorized by the exercise of the right of eminent domain; and that a temporary injury or occupation amounts to a taking of the property.

If it be admitted, that such an injury or occupation of the property amounts to a taking of it, in the sense in which the word taken is used in the constitution, it will follow, that measures must be taken to ascertain the damages occasioned thereby, and that compensation must be actually made, before it can be so injured or occupied; or that the right to do it, without compensation first made, must be admitted, leaving the party injured to the chance of obtaining compensation as he may best be able. If the former alternative be adopted, private property cannot be injured or temporarily occupied, however urgent and immediate may be the public necessity, without waiting for the final completion of all proceedings to ascertain the compensation. And how the amount of compensation can be satisfactorily ascertained before the acts occasioning damages have been performed, it is not easy to perceive.

If the latter alternative be adopted, and the right to cause a temporary occupation or injury be admitted before compensation is made, the party injured must depend upon a legislative provision for his compensation; and the prohibitory clause of the constitution will fail to secure to him, with entire certainty, a compensation. In other words, it will of itself afford him no protection against such temporary injury or occupation; and would leave him in the position, in which he would be by a construction of that clause which would only protect him against a permanent appropriation of his property, or an extinguishment or diminution of his title to it.

Many of the judicial opinions urgently restrictive of the leg-

islative power assert, that the title to land taken or to an easement in it, cannot be transferred from the owner to others for public use without compensation actually made ; that the acts of payment and of transfer are simultaneous. If this be true, it is immaterial, so far as it respects the acquisition of a title to land or to an easement in it for public use, when compensation is made. It can only be material to insist, that compensation shall be made before an exclusive occupation is permitted, to prevent a temporary inconvenience and loss. An attempt has already been made to show, that such was not the design of the prohibitory clause.

In the case of *Callender* v. *Marsh,* 1 Pick. 430, the opinion states, that the clause " has ever been confined, in judicial application, to the case of property actually taken and appropriated by the government."

In the case of *Hooker* v. *The New Haven and Northampton Co.* 14 Conn. 146, WILLIAMS, C. J., says, that the canal being made in the place designated " and the damages assessed and paid, it became a canal legally authorized and the company became vested with the legal right to the enjoyment of their property." And SHERMAN, J., says, " that the only limitation at common law or by any constitution to the legislative power over individual property is, that what is taken must be paid for."

In the case of *Bradshaw* v. *Rogers,* 20 Johns. 103, SPENCER, C. J., says, " it is true, that the fee simple of the land is not vested in the people of the State, until the damages are appraised and paid ; but the authority to enter is absolute and does not depend on the appraisal and payment."

In the case of *Bloodgood* v. *The Mohawk and Hudson Rail Road Company,* 18 Wend. 9, MAISON, Sen., insists, that an entry and possession of the land taken in defiance of the rights of the owner, is a taking of it in the legal sense, and yet he admits, that the " legal fee may not be in them."

In the case of *Baker* v. *Johnson,* 2 Hill, 342, the opinion states, " Although the absolute fee did not pass to the State, until the appraisement of damages, yet the right to enter and

use the property was perfect the moment the appropriation was made." It is submitted, that a payment, as well as an appraisement, should have been required to pass the title.

In the case of *The People* v. *Hayden*, 6 Hill, 359, the opinion states, "the statute places the right to have compensation made, where the principle of the constitution places it, viz. upon the forcible devestment of the use and enjoyment of private property for the public benefit." If the devestment intended was of a permanent character there would be no objection made to it.

In the case of *Smith* v. *Helmer*, 7 Barb. 416, the opinion states, — "It is sufficient for this case, that the settled construction of the constitution, which prohibits private property to be taken for public use without just compensation, actual compensation need not precede the appropriation."

In the case of *Rubottom* v. *McClure*, 4 Black. 505, it was decided, that private property might be taken for public use, upon provision being made for a subsequent compensation.

In the case of *Thompson* v. *Grand Gulf R. R. Co.*, 3 How. Missis. 240, it was decided that compensation must be first made, the constitution of that State requiring that it shall not be taken "without a just compensation first made therefor."

In the case of *Pittsburg* v. *Scott*, 1 Penn. 309, it was decided, that it was not necessary, that compensation should be actually ascertained and paid before private property is appropriated to public use. That it was sufficient that an adequate remedy was provided by which compensation could be obtained without any unreasonable delay. To the construction of the prohibitory clause proposed, it may be objected, that it will not prevent the exercise of legislative power to authorize the commission of serious injuries upon private property without making provision for compensation.

A construction so broad as to prevent this, would greatly limit the legislative power, and bring it within a much narrower sphere of action, than it was accustomed to claim and exercise without complaint, before the constitutions contain-

ing this clause were framed.  Reliance must be placed upon the justice of legislation, and upon the administration of the laws for a recompence for such injuries, and not upon a provision of the constitution, not designed for such a purpose.

Another objection to this construction may be, that the owner will not be able to recover compensation for the exclusive occupation of his land, and for the injuries thereby occasioned, when the proceedings are not so completed and compensation made as to transfer any title to land or to an easement in it for public use.

This objection is believed to be founded upon an incorrect position.  If compensation be not made within a reasonable time after the land has been exclusively occupied, the right to continue that occupation will become extinct.  It being authorized only as a part of the proceedings permitted for the acquisition of title, when it becomes manifest by an unreasonable delay, that the avowed purpose is not the real one, or that, if real, it has been abandoned, the measures permitted for that purpose will no longer be authorized ; and if the occupation be continued after that time, the occupants will be trespassers, and liable to be prosecuted as such.  The damages occasioned before the right of exclusive occupation became extinct may be recovered by an action of trespass or by an action on the case containing in the declaration averments, that an exclusive occupation was authorized for the purpose of acquiring title for public use, and that no such proceedings have taken place as would transfer any title within a reasonable time, with other suitable averments.  If the occupants should be regarded as trespassers *ab initio,* it would not be, as has been supposed, because they had omitted to make compensation, but because they had continued to occupy or commit trespasses after it had become manifest, that their avowed was not their real purpose, or after their real purpose had been abandoned.

It is not necessary to decide, whether such an action could be maintained, for the distinction between the actions of trespass and case has been abolished in this State.

Cushman *v.* Smith.

After some difference of opinion it may now be regarded as settled, that enactments, which authorize private property to be taken for public use must provide the means or course to be pursued to have compensation made for it.

The conclusions to which this discussion leads are: —

1. The clause in constitutions, which prohibits the taking of private property for public use, was not designed to operate, and it does not operate, to prohibit the legislative department from authorizing an exclusive occupation of private property temporarily, as an incipient proceeding to the acquisition of a title to it or to an easement in it.

2. It was designed to operate and it does operate to prevent the acquisition of any title to land or to an easement in it or to a permanent appropriation of it, from an owner for public use, without the actual payment or tender of a just compensation for it.

3. That the right to such temporary occupation as an incipient proceeding, will become extinct by an unreasonable delay to perfect proceedings, including the actual payment or tender of compensation to acquire a title to the land or of an easement in it.

4. That an action of trespass *quare clausum* may be maintained to recover damages for the continuance of such occupation, unless compensation or a tender of it be made within a reasonable time after the commencement of it.

5. That under such circumstances an action of trespass, or an action on the case, may be maintained to recover damages for all the injuries occasioned by the prior occupation.

In this case as no compensation or tender of it was made to the plaintiff within a reasonable time after his estate was occupied by the corporation, no title to it or to an easement in it has been acquired, and the occupation, although legally commenced, has ceased to be legal.

As the corporation acquired no title to the land or to any easement in it, the defendant could acquire none by his conveyance from that corporation.        *Defendant defaulted.*