*In re* Pawtucket and Central Falls Grade Crossing Commission.

FEBRUARY 27, 1914.

Present: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1)    *Constitutional Law. Railroads. Eminent Domain. Construction.*

An act designed for the abolition of grade crossings provided in its various sections for the cost, the taking of the land and the other details of the work, using the term throughout the act "railroad corporations" without using any corporate designation.

*Held,* that the act was passed with reference to the state of transportation facilities at the locality affected, which was in its general features a matter of common knowledge and within the knowledge of the legislature, *i. e.* that two corporations, the P. & W. R. R. Co. and the B. & P. R. R. Co. were owners of the railroad location and the railroad was operated by the N. Y., N. H. & H. R. R. Co. under a long lease.

(2)    *Constitutional Law. Eminent Domain. Railroads. Statute of Construction.*

Pub. Laws, cap. 896, "An act providing for the abolition of certain grade crossings in the cities of Pawtucket and Central Falls, passed at the January Session, 1912," established a commission and provided that such commission

should determine which of the parties interested should do the work, or should apportion the work to be done between each of the cities and railroad corporations interested; that the railroad corporations should pay a certain percentage of the cost and the remainder of the expense should be apportioned between the cities; that the commission should return its decision showing the proposed lay-out to the Superior Court and the decree of said court confirming such decision should be final; that the decree of the court confirming such decision should constitute a taking of the land specified in said decree; that all damages which might be sustained by any person by the taking of the land for the railroads should primarily be paid by the respective railroad corporations, and if the parties interested could not agree upon such damages the commission should assess the same and report to the Superior Court such disagreement and the amount of damages by them assessed against the railroad corporations and the cities, respectively, and any party aggrieved by such assessment might have such damages determined by a jury on petition filed within one year after the filing of said report, in the same way as damages are determined which are caused by the taking of land for public ways in cities; that the Superior Court should have jurisdiction in equity to enforce compliance with the provisions of the Act. This act was amended by caps. 1008 and 1009 of the Public Laws, passed at the January Session, 1913, providing for possession to be taken by either of the cities or by any railroad corporation upon giving security under the direction of the Superior Court, and that the commission might report its awards from time to time, and might be required to make partial reports on petition of any party in interest.

Under the provisions of this Act the commission decided that the land should be taken by the N. Y., N. H. & H. R. R. Co., a railroad corporation operating under a lease from two railroad corporations which owned the railroad location. Before any attempt was made to secure possession, security was fixed by the court after notice to the parties under the provisions of cap. 1008.

*Held*, that under the terms of the Act the railroad corporation which took the land was made liable for the payment of the compensation to the owner.

*Held*, further, that although the Act used the words "railroad corporations" it would, to carry out the legislative intent, be construed under Gen. Laws, 1909, cap. 32, § 3, to embrace the singular number.

*Held*, further, that after the confirmation by the Superior Court of the decision of the commission, a definite corporation was made liable for the damages sustained, which corporation could by the Superior Court be compelled to make payment either under a voluntary agreement of the parties or after a jury trial. At the time of the passage of cap. 896, General Laws 1909, cap. 215 § 58, provided that no railroad corporation should enter upon or use the land located for the use of their railroad until such corporation should have given such security for the payment of all such damages as should be finally awarded for such land and for costs as should be required by the commissioners appointed to estimate damages.

*Held*, further, that cap. 896 of the Public Laws did not repeal General Laws of 1909, cap. 215, § 58, and was not in conflict with it.

(3) *Constitutional Law. Eminent Domain. Giving Security.*

*Held*, further, that cap. 896 was not repugnant to Article 1, section 16 of the constitution: "Private property shall not be taken for public uses without just compensation" by reason of its omission of the provision for the giving of security by the railroad corporation before entry upon the land, but that with Gen. Laws, 1909, cap. 215, § 58, the statutory provision for the giving of such security was sufficient to meet the requirements of the constitution.

(4) *Constitutional Law. Payment of Compensation. Eminent Domain.*

*Held*, further, that the Act was not repugnant to said Article 1, § 16, in that it did not provide that payment or tender or deposit of just compensation should precede or be concurrent with the entry upon the land intended to be taken, since the legislative power is not limited by the constitution as to the proceeding to be followed in the taking of private property for public uses and in causing just compensation to be made. The occupation of property as an initiatory proceeding to an acquisition of the title to it does not amount to a taking of it within the contemplation of Art. 1, § 16, since the owner can only be divested of his title by the payment of compensation, and although security be given, the provision of the constitution cannot be made void and of no effect by reason of failure of the security for compensation.

In the absence of a distinct provision of the constitution requiring payment of compensation to precede the entry upon the property, such compensation need not be paid or tendered before entry upon the property, but the owner is entitled to reasonable, certain and adequate provision for obtaining such compensation, either in the act under which such property is to be taken or in existing law before his occupancy is disturbed.

*Held*, further, that said Act was not objectionable because no time was fixed within which the commission must make its report of assessments of damages, since it could not be assumed that the commission would fail in its duty to report with due promptness and there was due statutory provision for security for compensation before entry, and because under the provisions of cap. 1009 of the Public Laws, in amendment to cap. 896, the commission was required on petition of any party in interest under the direction of the court to make separate reports of the damages assessed by them.

(5) *Constitutional Law. Jury Trial. Eminent Domain.*

*Held*, further, that the Act was not objectionable in providing for the assessment of damages by a commission which had already taken part in negotiations to acquire the land, since any dissatisfied land owner had the right to a jury trial, with the further right to have the rulings of the trial court reviewed by the Supreme Court.

(6) *Eminent Domain. Railroads. Constitutional Law.*

*Held*, further, that said Act was not repugnant to Sec. 1, Article 9 of the Amendments to the Constitution, providing: "No corporation shall be created with power to exercise the right of eminent domain except by special act of the General Assembly upon petition for the same, the pendency

whereof shall be notified as may be required by law." The inference of the legislative intent not to form a corporation could be inferred, because the commission could fully perform its duties without corporate existence.

(7)  *Final Revisory Power.*

*Held,* further, that said Cap. 896 was not repugnant to Sec. 1, Art. 12 of the Amendments to the Constitution in that by the provision "the decree of said court (The Superior Court) confirming said decision shall be final and binding" it purported to deprive the Supreme Court of its final revisory and appellate jurisdiction, since the word "final" must be construed to mean that the decree was final in the Superior Court, but subject to revision by the Supreme Court, but even if the act purported to make the decree of the Superior Court final and beyond review, the Supreme Court would nevertheless by virtue of Art. 12 of Amendments have power to review the decision by proper proceedings.

PETITION for an order giving possession of land under an act for the abolition of grade crossings. Heard on certification on constitutional questions.

JOHNSON, C. J. This case is before this court on certain constitutional questions certified by the Superior Court under Gen. Laws, 1909, Chap. 298, § 1.

The Pawtucket and Central Falls Grade Crossing Commission was created by Chapter 896 of the Public Laws, entitled "An Act providing for the Abolition of Certain Grade Crossings in the cities of Pawtucket and Central Falls," passed at the January Session, 1912. Said act provides: "Section 1. In order that the safety of the public may be assured the grade crossings at Pine street, Dexter street and Broad street, in the city of Pawtucket, and at Central street, and Foundry street, in the city of Central Falls, shall be eliminated and altered. Within thirty days after this act becomes operative the governor shall appoint three suitable persons, one of whom shall be a resident of the city of Pawtucket, one a resident of the city of Central Falls, and one a civil engineer in the employ of the New York, New Haven and Hartford Railroad Company, and they and their successors are hereby constituted a commission to be known as the Pawtucket and Central Falls Grade Crossing Commission, and said commission is hereby authorized, empowered and directed to elimi-

nate and alter the said grade crossings in the manner hereinafter provided." The section then provides for the filling of vacancies, the appointment of a secretary and the employment of clerical assistance.

"Sec. 2. Said commission shall prescribe the manner and limits of the elimination and alteration of said grade crossings and of the alteration of the approaches thereto, and of the location of the railroads and any streets and highways · affected thereby. Said commission shall further determine which of the parties interested shall do the work, or shall apportion the work to be done between each of the cities and railroad corporations interested therein; and shall further determine whether there shall be one or more passenger stations in each of said cities, and the location, form of construction and cost thereof. The railroad corporations, except as hereinafter provided, shall pay sixty-five per cent. of the total actual cost of the elimination and alteration aforesaid including therein, in addition to the cost of construction, the cost of hearings, the compensation and necessary expenses of the commission and all damages, and the remaining thirty-five per cent. shall be apportioned by the commission equitably between, and shall be paid by the two cities.

"Sec. 3. The commission shall specify what portion, if any, of an existing public or private right of way shall be discontinued, what changes shall be made in the manner in which the tracks of the railroad corporations shall be carried through said cities, what highways shall be carried under or over the tracks of said railroads, and what, if any, new highways shall be laid out, and what, if any, changes shall be made in the location of the right of way and in the grades and alignments of the tracks of said railroad corporations, the general method of construction, and what land or other property, including land necessary for slopes, it considers necessary to be taken. Said commission shall forthwith return its decision in triplicate, accompanied by plats in duplicate, showing the proposed layout in each city, re-

spectively, to the Superior Court for the counties of Providence and Bristol, and the decree of said court confirming such decision shall be final and binding. If the commission decides that the location of the railroads, or of the public or private ways shall be changed, the decree of the court confirming such decision shall constitute a taking of the land or other property specified in said decree; and the clerk of said court, within thirty days after the entry of said decree, shall cause a copy of said decision so filed, together with a copy of the decree thereon, to be filed with the city clerks, respectively, of the cities of Pawtucket and Central Falls. At the time of filing said decision and decree, the duplicate plat affecting land in Pawtucket shall be filed by said court clerk with the city clerk of said Pawtucket, and the duplicate plat affecting land in Central Falls with the city clerk thereof, and such decisions, decrees and plats shall be by such city clerks, respectively, recorded in said cities. Such taking shall be a taking by said cities, respectively, if the land is to be used for a public way, or by the railroad corporations, if the land is to be used for a private way or by the railroads.

"Sec. 4. All damages which may be sustained by any person in his property by the taking of land for, or by the alteration of the grade of, a public way, or by an abutter thereon, by the discontinuance of such public way to the same extent as damages are recoverable by abutters on ways discontinued by cities, shall primarily be paid by the said cities, respectively; and all damages which may be caused by the taking of land for the railroads, or by the change or discontinuance of a private way in connection with the elimination and alterations of such grade crossings shall primarily be paid by the respective railroad corporations, and all damages which may be sustained by any person by the abolition of private ways, except as hereinafter provided, shall primarily be paid by the respective railroad corporations. If the parties interested cannot agree upon such damages the commission shall assess the same, and shall report to

said Superior Court such disagreement and the amount of damages by them assessed against the railroad corporations and the cities, respectively, and shall further cause notice of the filing of such report in said court to be published once each week for three successive weeks in a public newspaper published in the city of Providence, and in a public newspaper published in the city of Pawtucket, such notices to be published forthwith upon the filing of such report. Any party aggrieved by such assessment may have such damages determined by a jury of said Superior Court, on petition filed within one year after the filing of said report, in the same manner as damages are determined which are caused by the taking of land for the laying out or discontinuance of public ways in cities, and such proceedings shall carry costs as in other civil cases. If no petition be brought as aforesaid within one year after the filing of said report, then upon motion of any party interested, the said Superior Court shall by its decree confirm said report and thereupon order such damages paid by the cities or railroad corporations, respectively, against whom such damages have been respectively assessed, to the person in whose favor the same have been assessed, which damages shall be in lieu of any damages sustained by such persons by reason of the taking of land, the alteration of any grade, the discontinuance of any public way, and the abolition of any private way, under the provisions of this act. All expense which results from the necessary relocating of or changing of streams or water courses forming natural drainage channels of the territory in which alterations of grade are authorized, and of sewers, drains and pipes therein owned and operated by said cities, respectively, shall primarily be paid by said cities, respectively, and shall be part of the actual cost of the alterations mentioned in Section 3.

"Sec. 5. The said Superior Court shall have jurisdiction in equity to enforce compliance with the provisions of this act, and with the decrees, decisions and agreements made thereunder; and may issue and enforce such interlocutory decrees and orders as justice may require."

The remaining sections of the act provide for the auditing and apportionment of the cost of the improvement, the maintenance and repair of the new bridges and ways, the raising of money by the cities interested, and for a preliminary appropriation.

This act was amended by two acts passed at the January Session, A. D. 1913, viz: Chapter 1008, which provides for possession to be taken by either of the cities of Pawtucket and Central Falls, or by any railroad corporation on giving security under direction of the Superior Court; and Chapter 1009, which provides that the Commission may report its awards from time to time, and that it may be required to make partial reports on petition of any party in interest.

Acting under the provisions of Chapter 896, the Commission proceeded to formulate a scheme of abolition of grade crossings, and filed its "decision" under the terms of which certain land was taken by each of the cities and certain land by the New York, New Haven and Hartford Railroad Company; this decision was confirmed by decree of the Superior Court entered on the 18th day of December, 1912.

The Commission thereafter proceeded with its duties under the act and no agreement having been reached with Frank E. Tingley, whose land was necessary for a continuation of the work of abolition of grade crossings, and by the decision of the Commission confirmed by the decree of the Superior Court had been taken by the New York, New Haven and Hartford Railroad Company, the Commission filed in the Superior Court a petition for an order giving possession of said land. The petition being called for trial, said Tingley, by his attorneys, filed an answer whereby he challenged the constitutionality of Chapter 896 as violating certain provisions of the constitution of the State and the questions raised were thereupon certified to this court.

The record raises the following questions: I. Is Chapter 896 in violation of Section 16 of Article I of the Constitution? II. Is Chapter 896 in violation of Section 1 of Article IX of

the Amendments to the Constitution? III. Is Chapter 896 in violation of Section 1 of Article XII of the Amendments to the Constitution?

Section 16 of Article I of the Constitution is as follows: "Private property shall not be taken for public uses, without just compensation."

The answer filed on behalf of Mr. Tingley sets up six points wherein he claims the act violates this section:

1. There is no reasonable, certain, adequate, or sufficient provision therein for the payment of compensation for the taking of said land.

2. It is not determined therein what corporation or corporations are thereby authorized to take said land.

3. It is not determined therein what "railroad corporations" are made liable for the payment of compensation for land taken for railroad purposes.

4. There is no person or body corporate who is therein made liable for the payment of compensation for land taken for railroad purposes.

5. There is no fund provided for therein, out of which payment for land taken for railroad purposes is to be made.

6. There is no time fixed therein, within which the said commission is to assess damages for the taking of said land and make report thereon to this court.

We think that it may be presumed that the General Assembly enacted said Chapter 896 with reference to the state of transportation facilities at the locality affected, which was and is, in its general features, a matter of common knowledge, and within the knowledge of the Legislature.

Two railroad corporations, viz., the Providence and Worcester Railroad Company and the Boston and Providence Railroad corporation, were the owners of the railroad location, and the railroad was operated by the New York, New Haven and Hartford Railroad Company under a long lease.

The General Assembly instead of providing which corporation or corporations shall take the land, has provided a Commission and left the details to be worked out by the

Commission, providing in the act, that when any land is taken for railroad purposes, the damages thereby caused shall be primarily paid by "the respective railroad corporations;" and in Section 4, providing that the Superior Court shall upon confirmation of the report of the Commission assessing the damages "order such damages paid by the cities or railroad corporations, respectively, against whom such damages have been respectively assessed, to the person in whose favor the same have been assessed."

Under the provisions of the act, the Commission decided that the land should be taken by the New York, New Haven and Hartford Railroad Company, the operating corporation, upon which would fall, in the first instance, the duty of providing for payment, and reserved all rights of the other corporations, which under the respective leases, they or either of them might have in the land so taken.

It seems clear that by the terms of the act the railroad corporation which takes the land is made liable for the payment of the compensation to the owner. "All damages which shall be caused by the taking of land for the railroads . . . shall primarily be paid by the respective railroad corporations."

The act is not rendered any less certain by the use in some portions, of the word "corporations" in the plural, for this will, to carry out the legislative intent, be construed to "extend to and to embrace the singular number." Gen. Laws, 1909, Chap. 32, § 3.

As soon as the Commission renders its decision determining by which corporation or corporations the land is to be taken, and this decision is confirmed by decree of the Superior Court, there is a definite body corporate which, by the act, is made liable for the damage sustained.

If the parties agree, the railroad company pays for the land, and failing to do so, can by the Superior Court be compelled to make payment, since that court has jurisdiction to enforce compliance with the "agreements" made thereunder.

If the parties fail to agree, the Commission assesses the damages, and reports to the court the assessment of damages against the railroad corporation, viz., the corporation or corporations taking the land, and if no jury trial is claimed, the court order the damages paid by the railroad corporations, respectively.

If any party is aggrieved by such assessment by the Commission he may on petition filed within one year after the filing of said report have his damages assessed by a jury, in the same manner as damages are determined which are caused by the taking of land for the laying out or discontinuance of public ways in cities.

This brings the procedure on jury trial within the provisions of Chapter 82 of the General Laws wherein Section 11 provides: "If any person through whose land a highway or driftway is laid shall be aggrieved by the doings of the committee or town council, he, his heir or devisee, may appeal to the Superior Court in accordance with the provisions of law with reference to appeals from town councils;" and Section 12 provides: "Such appeal shall be tried in the same manner as other civil causes pending in the Superior Court, and shall be subject to all provisions of law applicable to such causes."

If the statute makes the corporation liable to pay the damages sustained and specifies a sufficient remedy to recover them it is a sufficient compliance with the requirements of the constitution. *Brickett* v. *Haverhill Aqueduct Co.*, 142 Mass. 394.

Before any attempt was made to secure possession, Chapter 1008 was passed, providing for fixing security by the court after notice to the parties, and security was fixed by the court after such notice.

The cases generally hold that if there is reasonable, certain and adequate provision for obtaining compensation either in the statute under which the entry is made or in law existing at the time of the entry, it is sufficient. These decisions, however, have often been upon questions as to the

lawfulness of the entry raised by some proceeding taken after the entry had been made.  Here, however, the questions certified attack the constitutionality of said Chapter 896 of the Public Laws.  We will, therefore, consider said question with reference to said act in connection with the law at the time of the passage of said act.

In many of the original railroad charters in this State there was no provision for security to be given by the company as a condition of possession, the provision being that if payment shall not be made within a limited time after entry shall have been made on the land and construction, (3) commenced, the land owner shall have an action of debt against the corporation to recover the damages assessed by commissioners or fixed by a jury.  Charter of Boston and Providence Railroad and Transportation Company, Sec. 7, May Session, 1834, p. 35; Charter of Providence and Worcester Railroad Company, Sec. 8; May Session, 1844 p. 34; Charter of New York, Providence and Boston Railroad Company, Sec. 7; June Session, 1832, p. 67.

In 1845 an act was passed "construing and amending" the charter of the Providence and Worcester Railroad Company, by which the commissioners appointed to assess damages were required, on petition of any person whose land or materials were taken, to require the corporation to give security for the payment of damages, and the corporation could not enter on the land until security should be given. October Session, 1845, p. 67. Similar provisions are contained in many charters.

Chapter 215, Gen. Laws, 1909, Sec. 58, provides:  "No railroad corporation shall enter upon or use the land or materials located for the use of their railroad, except for the purpose of making surveys, until such corporation shall have given such security for the payment of all such damages as shall be finally awarded for such land or materials, and for costs, as shall be required by the commissioners appointed to estimate damages; nor shall such corporations enter upon or use such land or materials as aforesaid, unless, before the assessment by such commissioners notice that such

security will be given on request in writing to the commissioners, shall be served on all known persons interested in such land and materials and residing within this State, by delivering to them or by leaving at their last and usual places of abode a written statement as aforesaid."

Chapter 896 of the Public Laws did not repeal or attempt to repeal the above provision of the General Laws. It made no provision in conflict with it. It made no reference to it.

It has however been held in many jurisdictions that where an existing statute provides for compensation, a special act is not unconstitutional by reason of the omission of such provision. *Rogers* v. *Bradshaw*, 20 Johns. 735; *Smedley* v. *Erwin*, 51 Pa. St. 445; *In re Sharett's Road*, 8 Pa. St. 89; *In re N. Y. El. R. Co.* 70 N. Y. 327; *Brickett* v. *Haverhill Aqueduct Co.* 142 Mass. 394; *Salt Lake City Water, etc. Co.* v. *Salt Lake City*, 24 Utah, 282, 295.

*In re Sharett's Road, supra*, p. 92, the court said, speaking of the act before it: "As this act provides no mode for compensating the owners of the lands appropriated under it to public use, the question is presented whether a remedy is furnished by any of our statutes regulating roads and highways. If not, the act itself is in contravention of the constitutional prohibition forbidding the application of private property to public uses without just compensation being made." . . .

"The court of quarter sessions of Adams county being possessed of this jurisdiction, the special act of 1846 only interfered with it to the extent of directing the alley to be laid out and opened by the street and road commissioners, instead of a jury of view, acting under the supervision of the court. But this by no means withdrew the case from the operation of the general road law of 1836, providing for the assessment of the damages sustained by owners, nor deprived the court of its power to give effect to those provisions. The act of 1846 was interposed as a substitute for the act of 1836, so far as it went, and no further. Beyond this, the earlier statute remains untouched, and the last

is to be construed and treated in connection with and a part of it."

In *Rogers* v. *Bradshaw, supra,* the Chancellor, at page 744, said: "But the court below consider the absence of any provision in the act of 1820, for compensation to the owner of the land, for damages sustained by such an alteration of the road, as a still more serious difficulty in the application of the statute to the case. It appears to me to be a sufficient answer to this objection, that the act of 1817 had provided the remedy for compensation for every injury committed by the commissioners in the execution of their powers; and when new powers are added (though, I apprehend, the act of 1820 did not, on this point, confer any power not before existing), the same remedy would apply. All statutes, said Lord Mansfield (Doug. 30), which are *in pari materia,* are to be taken together, as if they were one law; and, in many instances, a remedy provided by one statute, will be extended to cases arising on the same subject matter under a subsequent statute. The act of 1820 was only a specification of the course of duty of the commissioners in a particular case; and it would have been quite unnecessary, and, in my humble opinion, quite idle, to have provided, that the general remedy for all damages occasioned by the exercise of any part of the whole mass of undefined power given by the act of 1817, should apply to a portion of that power exerted in the particular manner provided for by the act of 1820."

We therefore hold that said Chapter 896 of the Public Laws is not repugnant to Article I. Section 16 of the Constitution by reason of its omission of a provision for the giving of security by the railroad corporation before entry upon the land, but that with General Laws, 1909, Chapter 215, § 58, the statutory provision for the giving of such security is sufficient to meet the requirement of the Constitution.

(4)    Counsel for Mr. Tingley also contend that the act violates said Section 16, Article 1 of the Constitution, in that it

does not provide that payment or tender or deposit of just compensation shall precede or be concurrent with entry upon the lands intended to be taken. Counsel cite Lewis on Eminent Domain, 3d Edition, Vol. 2, § 678, p. 1162, where the author says: "As an original question, it seems clear that the proper interpretation of the constitution requires that the owner should receive his just compensation before entry upon his property. When an individual is ousted from possession under a claim of right, his property is taken from him, and, if he has not been paid an equivalent in money, it is taken from him without compensation. Some of the cases so hold. But in most states it is held that the making of compensation need not precede an entry upon the property, provided some definite provision is made whereby the owner will certainly obtain compensation."

By the legislative practice of this State, as we have seen, entry has been permitted to be made upon the land to be taken before tender or payment of compensation. The earlier charters provided that if payment shall not be made within a limited time after entry upon the land and construction commenced, the land owner shall have an action of debt against the corporation to recover the damages assessed by the commissioners or by a jury; and by later charters it was provided that the commissioners appointed to assess damages should, on petition of any person whose land or materials were taken, require the corporation to give security for the payment of damages, and the corporation could not enter on the land until security should be given. And this later provision has been incorporated in the statutes, Pub. Stats., 1882, Chap. 158, § 43, and Gen. Laws, 1896, Chap. 187, § 54, the provisions in said revisions being identical with those of Chap. 215, § 58, Gen Laws, 1909, quoted, *supra*. Such entry has been permitted in execution of the legislative power in the proceeding to be followed in taking private property for public uses, and in determining the manner in which the value of such property shall be ascertained and compensation made. The legislative

power is not limited by the Constitution as to the proceeding to be followed in the taking of private property for public uses, and in causing just compensation to be made.

In *Cushman* v. *Smith*, 34 Me. 247, 257, the court, Shepley, C. J., speaking of a like constitutional provision says: "This provision of the constitution was evidently not intended to prevent the exercise of legislative power to prescribe the course of proceeding, to be pursued to take private property and appropriate it to public use. Nor to prevent its exercise to determine the manner in which the value of such property should be ascertained and payment made or tendered. The legislative power is left entirely free from embarrassment in the selection and arrangement of the measures to be adopted to take private property and appropriate it to public use, and to cause a just compensation to be made therefor."
. . . And again, p. 258: "The design appears to have been simply to declare, that private property shall not be changed to public property, or transferred from the owner to others, for public use, without compensation: to prevent the personal property of individuals from being consumed or destroyed for public use without compensation; not to protect such property from all injury by the construction of public improvements; not to prevent its temporary possession or use, without a destruction of it, or a change of its character. It was designed also to prevent the owner of real estate from being deprived of it, or of an easement in it, and to prevent any permanent change of its character and use without compensation." . . .

Again, p. 259: "This leads to a further inquiry to ascertain the sense, in which the word *taken* was used in the constitution.

"That word is used in a variety of senses, and to communicate ideas quite different. Its sense, as used in a particular case, is to be ascertained by the connection in which it is used, and from the context, the whole being applied to the state of facts, respecting which it was used.

"It cannot well be denied, and it is generally admitted,

to have been used in constitutions containing this clause, to require compensation to be made for private property appropriated to public use, by the exercise on the part of the government of its superior title to all property required by the necessities of the people to promote their common welfare. This appears to have been denominated the right of eminent domain, of supereminent dominion, of transcendental propriety. These terms are of importance only to disclose the idea, presented by them, that the right to appropriate private property to public use rests upon the position, that the government or sovereignty claims it by virtue of a title superior to the title of the individual, and that by its exercise the individual and inferior title becomes wholly or in part extinguished; extinguished to the extent, to which the superior title is exercised. To take the real estate of an individual for public use, is to deprive him of his title to it, or of some part of his title, so that the entire dominion over it no longer remains with him. He can no longer convey the entire title and dominion.

"The exclusive occupation of that estate temporarily, as an initiatory proceeding to an acquisition of a title to it, or to an easement in it, cannot amount to a taking of it in that sense. The title of the owner is thereby in no degree extinguished. He can convey that title while thus exclusively occupied, as he could have done before. Should he do so by a conveyance containing a covenant, that it was free of all incumbrances, that covenant would not make him liable for such an exclusive occupation, unless it be admitted, that a title to the land or to an easement in it can be acquired without making compensation, and this is denied."

In *Cherokee Nation* v. *Kansas Railway Co.*, 135 U. S. 641, the court, p. 658, 659, 660, said: "It is further suggested that the act of Congress violates the Constitution in that it does not provide for compensation to be made to the plaintiff before the defendant entered upon these lands for the purpose of constructing its road over them. This

objection to the act cannot be sustained.   The Constitution declares that private property shall not be taken 'for public use without just compensation.'   It does not provide or require that compensation shall be actually paid in advance of the occupancy of the land to be taken.   But the owner is entitled to reasonable, certain and adequate provision for obtaining compensation before his occupancy is disturbed."
. . .   "The plaintiff asks, what will be its condition, as to compensation, if, upon the trial *de novo* of the question of damages, the amount assessed in its favor should exceed the sum which may be paid into court by the defendant?   This question would be more embarrassing than it is, if, by the terms of the act of Congress, the title to the property appropriated passed from the owner to the defendant, when the latter—having made the required deposit in court —is authorized to enter upon the land, pending the appeal, and to proceed in the construction of its road.   But, clearly, the title does not pass until compensation is actually made to the owner.   Within the meaning of the Constitution, the property, although entered upon, pending the appeal, is not taken until the compensation is ascertained in some legal mode, and, being paid, the title passes from the owner. Such was the decision in *Kennedy* v. *Indianapolis*, 103 U. S. 599, 604, where the court construed a clause of the constitution of Indiana, declaring that no man's property 'shall be taken or applied to public use, . . . without a just compensation being made therefor'—substantially the provision found in the national Constitution.   This court there said that 'on principle and authority the rule is, under such a constitution as that of Indiana, that the right to enter on and use the property is complete as soon as the property is actually appropriated under the authority of law for a public use, but that the title does not pass from the owner without his consent until just compensation has been made to him.'   In the case now before us, the property in respect to which the referees made the award will be conditionally appropriated for the public use when the defendant makes

a deposit in court of double the amount of such award, and it only remains to fix the just compensation to be made to the owner. But the title has not passed, and will not pass, until the plaintiff receives the compensation ultimately fixed by the trial *de novo* provided for in the statute. So that, if the result of that trial should be a judgment in its favor in excess of the amount paid into court, the defendant must pay off the judgment before it can acquire the title to the property entered upon, and failing to pay within a reasonable time after the compensation is finally determined, it will become a trespasser, and liable to be proceeded against as such. And, in such case, if the plaintiff shall sustain damages by reason of the use of its property by the defendant pending the appeal, the latter will be liable therefor. The apprehension, therefore, that the plaintiff may lose its property without receiving just compensation therefor, is without foundation.''

We heartily approve of the reasoning of these cases. The occupation of the property as an initiatory proceeding to an acquisition of the title to it, or to an easement in it, cannot amount to a taking of it in the sense of the word ''taken'' as used in the Constitution. The owner can only be divested of his title by the payment of the compensation. Although security be given the provision of the Constitution cannot be made void and of no effect by reason of failure of the security for compensation. As was said by Wood, C. J., in *Symonds* v. *City of Cincinnati*, 14 Ohio, 147, 173: ''The right of eminent domain, is an incident to sovereignty, and exists in every government. Private mischief, rather than public, of necessity must be endured. The obligation to make compensation, however, follows this right, as the shadow does the substance, and is concomitant with it.''

By the current of authorities, in the absence of a distinct provision of the Constitution requiring payment of compensation to precede the entry upon the property, it is held that compensation need not be paid or tendered before entry upon the property, but that the owner is however entitled

to reasonable, certain and adequate provision for obtaining compensation either in the act under which the property is to be taken or in existing law before his occupancy is disturbed. Among other cases holding this view are *Rogers* v. *Bradshaw*, 20 Johns. 735; *Smith* v. *Helmer*, 7 Barb. 416; *In re Petition of United States*, 96 N. Y. 227; *Hazen* v. *Essex Co.*, 12 Cush. 475; *Brickett* v. *Haverhill Aqueduct Co.*, 142 Mass. 394; *Woodbury* v. *Marblehead Water Co.*, 145 Mass. 509; *Old Colony R. R.* v. *Framingham Water Co.*, 153 Mass. 561; *Symonds* v. *City of Cincinnati*, 14 Ohio, 147; *State* v. *McIver*, 88 N. C. 686; *Salt Lake City Water, etc. Co.* v. *Salt Lake City*, 24 Utah, 282; *Cairo & Fulton R. Co.* v. *Turner*, 31 Ark. 494. These cases are, upon this question, in accord with the rule long recognized by legislation in this State and are also in accord with our own view upon this question.

Said Chapter 896 does not violate Section 16 of Article I of the Constitution in that it does not provide that payment or tender or deposit of just compensation shall precede or be concurrent with entry upon the lands intended to be taken.

A further objection is made on the ground that no time is fixed within which the Commission must make its report of assessment of damages.

The assessment of damages and the report of such assessment by the Commission is a part of the procedure to be followed in taking the land and making compensation therefor. It cannot be assumed that the Commission will fail in its duty to report with due promptness. There being due statutory provision for security for compensation before entry, we do not think said Chapter 896 of the Public Laws can be held to be unconstitutional because it does not fix the time within which the Commission shall make its report of the assessment of damages.

It is further to be noted that before any action was commenced to take possession of the property of the objecting land owner, Chapter 1009 of the Public Laws was passed, amending said Chapter 896, by adding thereto the following section: "Section 14. The commission, or a majority thereof,

may from time to time and shall whenever so directed by the Superior Court, on petition of any party in interest, make several and separate reports to said Superior Court of the damages assessed by them. All the provisions of Section 4 of Chapter 896 of the Public Laws, which are applicable to the final report of said commission shall be applicable to each such report. If all parties interested in any claim shall in writing waive their right to claim a jury trial, then upon motion of any party interested in such claims the Superior Court shall by its decree confirm the report thereon and thereupon order such damages paid by the cities or railroad corporations, respectively, against whom such damages have been respectively assessed to the person in whose favor the same have been assessed.''

In an early Indiana case, cited *supra*, the constitutionality of an act was attacked on the ground that no time was fixed within which the Commissioners were to make their report and the land owner had no power to hasten their action. The court held the act constitutional, saying: ''What would have been the effect of unreasonable delay on the part of the commissioners, it is unnecessary to determine, because no such delay is shown by the pleadings, and because, before the commencement of this suit the statute . . . was passed which placed it in the power of the complaining party to move first in procuring compensation.'' *Rubottom* v. *McClure*, 4 Blackf. (Ind.) 505.

It is also argued that the act does not provide proper means for ascertaining the damages, since these are to be (5) assessed by a commission which has already taken part in negotiations to acquire the land, and is therefore, presumably, not impartial.

When the report is made, however, notice is required to be given, and any dissatisfied land owner has a free and unfettered right to have a jury trial, with a full right to have the rulings of the trial court reviewed by the Supreme Court. This is all that is required by the Constitution. If somewhere in the proceedings an impartial tribunal is provided,

to which the land owner has full access, the requirement is satisfied, Lewis on Eminent Domain, 3rd Ed. § 511.

It is also urged that said Chapter 896 is in violation of Section 1 of Article IX of the Amendments to the Constitution.

That section provides that "no corporation shall be created with the power to exercise the right of eminent domain . . . . except by special act of the General Assembly upon petition for the same, the pendency whereof shall be notified as may be required by law."

The answer of Frank E. Tingley avers that the act creates in effect, a corporation with the power to exercise the right of eminent domain.

It is conceded that the act was not passed on petition for the same, the pendency whereof had been notified. The act creates a board or commission; a subordinate and temporary branch of the government, to which is delegated the power, and upon which is imposed the duty, of performing certain governmental work, viz.: The elimination of certain specified grade crossings, and the commission, as a branch of the government, is vested with the power of compelling certain corporations, already existing, to exercise the power of eminent domain; for by the terms of the act "such taking shall be a taking by said cities, respectively, . . . or by the railroad corporations."

It may be conceded that the General Assembly may create a corporation without expressly using the word. "But this implication, to be sufficient, must clearly evince or express the intention to establish or constitute a body politic or corporate, that is to invest it with corporate power. . . . Certain attributes or powers are absolutely essential to constitute a body corporate, such as perpetual succession, the right to contract and the right to sue and be sued as a corporation." Dillon on Municipal Corporations, § 42. "If powers and privileges are conferred upon a body of men . . . and if these cannot be exercised and enjoyed, and if the purposes intended cannot be carried into effect,

without acting in a corporate capacity, a corporation is, to this extent, created by implication. The question turns upon the intent of the legislature and this can be shown constructively as well as expressly." *Id.* § 43.

But this Commission lacks the essentials of a corporation. The act creates a commission, and there is nothing to indicate that any other body was intended to be created. As against the inference that the legislature intended by this act to form a corporation, it is also to be noted that the commission is created for a temporary purpose only and that no fund is provided. Under the rule that no intent to form a corporation can be inferred unless corporate existence is necessary for the exercise of the powers conferred and the discharge of the duties imposed, no such inference can be · drawn here, for this board can fully perform its task without corporate existence.

We therefore hold that said Chapter 896 of the Public Laws is not in conflict with Article IX, § 1 of the Amendments to the Constitution.

(7) It is also urged that said Chapter 896 is in conflict with Section 1 of Article XII of the Amendments to the Constitution. The language of the act to which this criticism is directed is "the decree of said court (the Superior Court) confirming said decision shall be final and binding." This, it is claimed, purports to deprive the Supreme Court of its "final revisory and appellate jurisdiction" conferred by Section 1 of Article XII of the Amendments.

The word "final" used in connection with a decree or judgment may bear either one of two meanings. It may refer to the termination of the litigation in the court referred to, subject to appeal or other review; or it may refer to exemption from review by a superior tribunal. It is an elementary principle of construction that to hold a statute constitutional, a court will go to the limits of reasonable construction; that when two constructions are open, both reasonable, that will be adopted which sustains the statute rather than that which will annul it.

The clause under consideration must be construed to mean that the decree is final in the Superior Court, but subject to revision by the Supreme Court. Even though the act purported to make the decree of the Superior Court final and beyond review, this Court would nevertheless by virtue of Article XII, have power to review the decision by proper proceedings. Gen. Laws, Chap. 272, § 2.

We therefore hold that the act is not in conflict with Section 1 of Article XII of the Amendments to the Constitution.

Our decision is that Chapter 896 of the Public Laws, passed at the January Session, 1912, taken in connection with General Laws, 1909, Chapter 215, Section 58, is not in violation of Article 1, Section 16 of the Constitution; and also that said act is not in violation of Article IX, Section 1, or Article XII, Section 1 of the Amendments to the Constitution.

The papers in the cause with our decision certified thereon are sent back to the Superior Court for further proceedings.

*Mumford, Huddy & Emerson, Charles C. Mumford* of counsel, for Commission.

*Henry W. Hayes, Boss & Barnefield,* for Frank E. Tingley.